**No. 25-7199**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

PEDRO RIOS, JR., ET AL.,

*Plaintiffs-Appellees*,

v.

HRB DIGITAL, LLC, ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the
Northern District of California, Case No. 3:25-cv-03530-EMC
Hon. Edward M. Chen, United States District Judge

**OPENING BRIEF OF DEFENDANTS-APPELLANTS**

Stacey Gilman
BERKOWITZ OLIVER LLP
2600 Grand Boulevard
Suite 1200
Kansas City, MO 64108
Telephone: (816) 561-7007
sgilman@berkowitzoliver.com

Archis A. Parasharami
Daniel E. Jones
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7160
archis.parasharami@skadden.com
daniel.jones@skadden.com

*Counsel for Defendants-Appellants HRB Digital, LLC and HRB Tax
Group, Inc.*

**ORAL ARGUMENT REQUESTED**

# CORPORATE DISCLOSURE STATEMENT

Defendants-Appellants HRB Digital, LLC and HRB Tax Group, Inc. are each wholly-owned indirect subsidiaries of H&R Block, Inc., a publicly traded company. BlackRock, Inc., through its subsidiaries, is the beneficial owner of more than ten percent of the common stock of H&R Block, Inc.[1] As of this filing, defendants-appellants are not aware of any other publicly-held corporation owning ten percent or more of H&R Block, Inc.'s stock.

---

[1] Information as to BlackRock, Inc.'s ownership is furnished in reliance on the Schedule 13G/A of BlackRock, Inc., filed with the Securities and Exchange Commission on January 23, 2024.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS .................................................................ii

TABLE OF AUTHORITIES ............................................................v

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ................................................. 4

ISSUES PRESENTED ................................................................ 5

STATEMENT OF THE CASE ....................................................... 6

    A.    Plaintiffs Agree To Arbitrate After Receiving Clear Notice Of The Arbitration Agreement And Its Opt-Out Provision. ..................................................... 6

    B.    The Terms Of Plaintiffs' Arbitration Agreements. ............... 8

    C.    Plaintiffs Invoke The Arbitration Process Multiple Times, Including As Part Of A Larger Group Of Similar Claims That Reflect Inadequate Vetting By Their Counsel. .................................................. 11

    D.    Plaintiffs File This Lawsuit. ................................ 15

    E.    The District Court Denies H&R Block's Motion To Compel Arbitration. ...................................... 15

SUMMARY OF ARGUMENT .................................................... 18

STANDARD OF REVIEW ......................................................... 23

ARGUMENT .......................................................................... 23

I.    The District Court Erred In Holding That The Arbitration Agreement Is Unconscionable. ....................................... 24

A. The Arbitration Agreement Is Not Procedurally Unconscionable.....................................................................25

    1. This Court's decision in *Mohamed* and the arbitration agreement's clear opt-out provision are dispositive. ...........................................................25

    2. The district court's reasons for refusing to apply *Mohamed* are wrong.....................................................31

    3. The arbitration agreement is neither surprising nor oppressive. ...........................................................38

B. The Arbitration Agreement Is Not Substantively Unconscionable.....................................................................46

    1. The staging procedures are enforceable. .....................47

        a. *The staging procedures are modeled after MDL processes in court.* .....................................47

        b. *Other courts have upheld—or even required—similar staging procedures.* ...............51

        c. *Plaintiffs did not show that staging procedures would result in unconscionable delay.* .............................................................54

        d. *Staging procedures are an appropriate response to widespread mass arbitration abuses.* .............................................................58

        e. *The district court's remaining criticisms of staging procedures are misplaced.* .......................62

    2. The tolling provision in the pre-arbitration process is enforceable.....................................................63

    3. The arbitration agreement does not offend *Heckman*....................................................................67

iii

II.    The FAA Preempts The District Court's Substantive Unconscionability Holdings. ........................................................ 71

CONCLUSION ................................................................................ 76

STATEMENT OF RELATED CASES .................................................. 77

CERTIFICATE OF COMPLIANCE ...................................................... 78

CERTIFICATE OF SERVICE ............................................................. 79

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AGK Sierra De Montserrat, L.P. v. Comerica Bank,*
  109 F.4th 1132 (9th Cir. 2024) ............................................... 31, 32

*Allan v. Snow Summit, Inc.,*
  51 Cal.App.4th 1358 (1996) ........................................................ 73

*Armendariz v. Foundation Health Psychcare Services, Inc.,*
  6 P.3d 669 (Cal. 2000) ............................................................... 25

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) .......................................................... *passim*

*Baltazar v. Forever 21, Inc.,*
  367 P.3d 6 (Cal. 2016) .......................................................... 24, 26

*Bielski v. Coinbase, Inc.,*
  87 F.4th 1003 (9th Cir. 2023) ..................................................... 64

*Bonhomme v. Uber Technologies, Inc.,*
  2025 WL 1745729 (N.D. Cal. June 24, 2025) .............................. 29

*Briggs v. Merck Sharp & Dohme,*
  796 F.3d 1038 (9th Cir. 2015) ..................................................... 48

*Brooks v. WarnerMedia Direct, LLC,*
  2024 WL 3330305 (S.D.N.Y. July 8, 2024) .................................. 53

*Caimano v. H&R Block,*
  2024 WL 3295589 (E.D. Pa. July 3, 2024) ................................... 30

*California Crane School, Inc. v. Google LLC,*
  2025 WL 2541913 (9th Cir. Sept. 4, 2025) .................................. 28

*Carbajal v. H&R Block Tax Services, Inc.,*
  372 F.3d 903 (7th Cir. 2004) ...................................................... 75

v

*Chamber of Commerce v. Bonta,*
    62 F.4th 473 (9th Cir. 2023)......................................... 25, 71, 74, 75

*Chavoya v. Merrill Gardens L.L.C.,*
    2025 WL 2196296 (E.D. Cal. July 31, 2025).................................29

*Circuit City Stores, Inc. v. Ahmed,*
    283 F.3d 1198 (9th Cir. 2002) ................................................25, 27

*Cordero v. Coinbase, Inc.,*
    2025 WL 2223495 (N.D. Cal. Aug. 5, 2025) .................................. 70

*Da Silva v. DSW Shoe Warehouse, Inc.,*
    2025 WL 3187760 (N.D. Cal. Nov. 14, 2025) ................................29

*Davenport v. Nvidia Corp.,*
    719 F. Supp. 3d 1019 (N.D. Cal. 2024) .........................................39

*Davis v. Experian Information Solutions, Inc.,*
    2025 WL 2998157 (N.D. Cal. Oct. 24, 2025).................................. 70

*Diaz v. T-Mobile USA, Inc.,*
    2026 WL 495233 (E.D. Cal. Feb. 20, 2026)...................................52

*Doctor's Associates, Inc. v. Casarotto,*
    517 U.S. 681 (1996) ............................................................... 40, 42

*Dotson v. Amgen, Inc.,*
    181 Cal.App.4th 975 (2010)..........................................................38

*Epic Systems Corp. v. Lewis,*
    584 U.S. 497 (2018) ...................................................... 23, 72, 74, 75

*Fish v. Tesla, Inc.,*
    2022 WL 1552137 (C.D. Cal. May 12, 2022)................................30

*Flores v. American Seafoods Co.,*
    335 F.3d 904 (9th Cir. 2003) ........................................................37

*Gentry v. Superior Court,*
    165 P.3d 556 (Cal. 2007) ........................................... 27, 32, 33, 34

vi

*George v. eBay, Inc.,*
    71 Cal.App.5th 620 (2021)...............................................................58

*Guerrero v. Citibank, N.A.,*
    2025 WL 2483161 (N.D. Cal. Aug. 28, 2025)................................29

*In re Hanford Nuclear Reservation Litigation,*
    534 F.3d 986 (9th Cir. 2008) ........................................................48

*Haydon v. Elegance at Dublin,*
    97 Cal.App.5th 1280 (2023).................................................... 34, 35

*Heckman v. Live Nation Entertainment, Inc.,*
    120 F.4th 670 (9th Cir. 2024)................................................. 68, 69

*Houtchens v. Google LLC,*
    649 F. Supp. 3d 933 (N.D. Cal. 2023) ...........................................29

*Hunt v. Meta Platforms, Inc.,*
    729 F. Supp. 3d 964 (N.D. Cal. 2024) ...........................................29

*Jones v. Starz Entertainment, LLC,*
    129 F.4th 1176 (9th Cir. 2025)..................................... 1, 55, 59, 70

*Kaplan v. Athletic Media Co.,*
    705 F. Supp. 3d 992 (N.D. Cal. 2023) ...........................................29

*Kilgore v. KeyBank, National Ass'n,*
    718 F.3d 1052 (9th Cir. 2013) .......................................................25

*Kindred Nursing Centers Limited Partnership v. Clark,*
    581 U.S. 246 (2017) ........................................................ 42, 71, 72

*Kurashige v. Indian Dunes, Inc.,*
    200 Cal.App.3d 606 (1988) ...........................................................73

*Lamps Plus, Inc. v. Varela,*
    587 U.S. 176 (2019) ................................................................ 72, 74

*Lanigan v. City of Los Angeles,*
    199 Cal.App.4th 1020 (2011).................................................. 38, 43

*Li v. ArcSoft, Inc.*,
    160 F.4th 1063 (9th Cir. 2025)......................................................33

*Marquez v. Adobe, Inc.*,
    2026 WL 886617 (N.D. Cal. Mar. 31, 2026)..................................29

*Meadows v. Cebridge Acquisition, LLC*,
    132 F.4th 716 (4th Cir. 2025).......................................................64

*Medhat v. JP Morgan Chase Bank, N.A.*,
    2026 WL 1333764 (N.D. Cal. May 13, 2026) ...............................29

*Mohamed v. Uber Technologies, Inc.*,
    848 F.3d 1201 (9th Cir. 2016) ............................................. *passim*

*O'Dell v. Aya Healthcare Services, Inc.*,
    171 F.4th 1173 (9th Cir. 2026)............................................... 23, 69

*Oblix, Inc. v. Winiecki*,
    374 F.3d 488 (7th Cir. 2004) .......................................................72

*OTO, LLC v. Kho*,
    447 P.3d 680 (Cal. 2019) ....................................................... 40, 46

*Pabon v. HRB Digital LLC*,
    2025 WL 2254008 (E.D.N.Y. Aug. 7, 2025)...................................29

*Pandolfi v. AviaGames, Inc.*,
    2025 WL 2463742 (9th Cir. Aug. 27, 2025) ..................................53

*Pappas v. AMN Healthcare Services, Inc.*,
    2025 WL 3720922 (9th Cir. Dec. 23, 2025) ..................................40

*Pilon v. Discovery Communications, LLC*,
    769 F. Supp. 3d 273 (S.D.N.Y. 2025) ..................................... 53, 71

*Poublon v. C.H. Robinson Co.*,
    846 F.3d 1251 (9th Cir. 2017) ..................................... 23, 35, 36, 38

*Rubio v. Aaron's LLC*,
    2024 WL 4904512 (E.D. Cal. Nov. 27, 2024) ...............................34

*Ruiz v. CarMax Auto Superstores, Inc.*,
    2024 WL 1136332 (C.D. Cal. Jan. 18, 2024) ................................. 52

*Sanchez v. Valencia Holding Co.*,
    353 P.3d 741 (Cal. 2015) ....................................................... *passim*

*Schlueter-Beckner v. SimpliSafe, Inc.*,
    2025 WL 2162948 (N.D. Cal. July 30, 2025) ............................... 28

*Serpa v. California Surety Investigations, Inc.*,
    215 Cal.App.4th 695 (2013) ......................................................... 63

*Singh v. Uber Technologies, Inc.*,
    67 F.4th 550 (3d Cir. 2023) ......................................................... 37

*Sonic-Calabasas A, Inc. v. Moreno*,
    311 P.3d 184 (Cal. 2013) ............................................................. 46

*State Farm Mutual Automobile Insurance v. Penske Truck Leasing
    Co.*,
    2021 WL 4810642 (9th Cir. Oct. 15, 2021) .................................. 33

*Swain v. LaserAway Medical Group, Inc.*,
    57 Cal.App.5th 59 (2020)........................................................ 33, 34

*Wray v. Humble Bundle, Inc.*,
    2025 WL 4662288 (N.D. Cal. Sept. 8, 2025) ............................... 70

## STATUTES

9 U.S.C. §§ 1-16 ...................................................................................... 4

9 U.S.C. § 2 ............................................................................................ 23

9 U.S.C. § 16(a)(1) ................................................................................... 5

28 U.S.C. § 1331 ...................................................................................... 5

28 U.S.C. § 1332(d) .................................................................................. 4

Cal. Civ. Code § 1670.5............................................................................ 56

Cal. Civ. Code § 1670.5(b) ...................................................................... 58

# RULES

Cal. R. Ct. 3.501-50 ................................................................................. 72

Cal. R. Ct. 8.1115(a) ............................................................................... 33

# OTHER AUTHORITIES

https://www.adr.org/about-us/ ............................................................... 55

https://www.adr.org/news-and-insights/what-2025-data-reveals-
about-mass-arbitration/ ..................................................................... 55

2 Corbin on Contracts (rev. ed. 1995) ................................................... 37

AAA's Mass Arbitration Supplementary Rules, Rule MA-1 .................. 62

Amy J. Schmitz, *Promise and Pitfalls of AI in Mass Arbitration*,
27 Cardozo J. Confl. Resol. 291 (2025) ............................................ 41

Ayelet Sela, *Technologies of Mass Arbitration*,
41 Ohio St. J. Disp. Resol. 149 (2026) ............................................. 41

Hon. Eldon E. Fallon et al., *Bellwether Trials in Multidistrict
Litigation*,
82 Tul. L. Rev. 2323 (2008) .............................................................. 47

Hon. Stephen R. Bough & Anne E. Case-Halferty, *A Judicial
Perspective on Approaches to MDL Settlement*,
89 UMKC L. Rev. 971 (2021) ........................................................... 49

*Manual for Complex Litigation, Fourth* § 20.132 (2004) ...................... 49

NYU Center on Civil Justice, *What the Data Show: Mapping
Trends in Multidistrict Litigation* (Sept. 2015) ...................... 49, 55

U.S. Chamber of Commerce Institute for Legal Reform, *Mass
Arbitration Shakedown: Coercing Unjustified Settlements*
(Feb. 2023) ................................................................... 11, 41, 59, 74

U.S. Chamber of Commerce Institute for Legal Reform, *Private Power, Public Harm: The Coercive Dynamics of Mass Arbitration* (Dec. 2025)................................................ 11, 41, 58, 59

U.S. J.P.M.L., *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2025* (2025) ......................... 48

## INTRODUCTION

Arbitration is a fair, simpler, and less expensive alternative to lawsuits in court, as the Supreme Court has repeatedly recognized. But recently, some lawyers have found a way to abuse the arbitration process through the use of improper mass arbitrations. Their playbook: File (or threaten to file) large numbers of individual arbitrations—asserting claims that are often unverified or unvetted—in an attempt to coerce settlement based on the potential arbitration fees that a business might have to pay regardless of whether the claims have any merit.

This Court has recognized this troubling phenomenon in a related context, explaining that the use of a particular "mass-arbitration tactic . . . appears to be geared more toward racking up procedural costs to the point of forcing [the company] to capitulate to a settlement than proving the allegations . . . to seek appropriate redress on the merits." *Jones v. Starz Ent., LLC*, 129 F.4th 1176, 1183 (9th Cir. 2025).

Here, plaintiffs-appellees Pedro Rios, Jr. and Christian Marquez are members of a group of claimants that their counsel recruited for such a mass arbitration against defendants-appellants HRB Digital, LLC and HRB Tax Group (together, "H&R Block"). But their plan ran into an

1

obstacle. To help address these increasingly-widespread concerns with abusive mass arbitrations, H&R Block had updated its Online Services Agreement ("OSA") to ensure that arbitration remains a feasible way to resolve claims based on the merits. The updated agreement created a structure of staged proceedings—modeled after court procedures for multidistrict litigations, or MDLs—that avoids the improper leveraging of arbitration fees and facilitates the orderly resolution of all cases tethered to the merits of the disputes.

Plaintiffs filed this putative class action lawsuit to challenge that agreement and instead proceed in court (even though their counsel has at the same time continued to pursue arbitration for the other claimants in the group against H&R Block). In response, H&R Block moved to compel arbitration of Plaintiffs' underlying claims. Plaintiffs admitted that they agreed to arbitration but argued that the provisions designed to address mass arbitration are unconscionable under California law. The district court accepted those arguments. That was error for multiple reasons.

To begin with, the district court never should have reached the substance of the staging procedures at all, because Plaintiffs failed to

2

demonstrate the existence of procedural unconscionability, as California law requires. The district court's contrary determination rested on defiance of this Court's precedents. Specifically, because Plaintiffs had 30 days to opt out of arbitration altogether and each revision to the arbitration provision—a right that was clearly and conspicuously disclosed—the arbitration agreement is not procedurally unconscionable.

Indeed, this Court previously reversed the same district judge on this exact point in *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016). Rather than honor this Court's reversal in *Mohamed*, the district court asserted that this Court should "revisit[] and overrule[] its own precedent." 1-ER-15. But that refusal to follow *Mohamed* was patently wrong. *Mohamed* remains good law, as numerous courts—including this one—have recognized. The district court pointed to a few purportedly intervening decisions by California state courts, but those decisions are inapposite—and do not come close to justifying the district court's disregard for this Court's precedent. Just as in *Mohamed*, the district court's palpable error on procedural unconscionability suffices to require reversal here.

3

But the district court also was wrong as to substantive unconscionability. A staging process for resolving large numbers of coordinated individual claims is fair—which is why federal courts do the same thing in the mass torts and MDL contexts. H&R Block's arbitration process, like that of many other companies, simply borrows this procedure from the federal courts. The district court's assertions of unconscionable delay failed to compare the staging process to any other real-world alternatives for resolving large numbers of individual claims or account for the practical reality of mass-arbitration abuses that the procedures are designed to address. And the district court's conclusion that parties cannot enter into arbitration agreements that adopt similar procedures used by courts every day runs headlong into the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, which prohibits precisely this sort of differential treatment of arbitration agreements.

This Court should reverse the decision below.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiffs seek to bring a class action that satisfies the statute's minimal diversity and amount-in-controversy

requirements. 2-ER-233. The district court also had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs allege federal claims under the Electronic Communications Privacy Act. 2-ER-254-257.

This Court has jurisdiction under 9 U.S.C. § 16(a)(1). The district court entered its order denying H&R Block's motion to compel arbitration on October 27, 2025 (1-ER-2), and H&R Block timely filed a notice of appeal on November 13, 2025 (2-ER-269).

## ISSUES PRESENTED

1. Whether the district court erred in holding that Plaintiffs' arbitration agreements are procedurally unconscionable under California law despite the conspicuously disclosed opt-out provision.

2. Whether the district court erred in holding that the staging procedures and pre-dispute tolling provision in Plaintiffs' arbitration agreements are substantively unconscionable under California law.

3. Whether the FAA preempts the district court's interpretation of California unconscionability law.

## STATEMENT OF THE CASE

### A. Plaintiffs Agree To Arbitrate After Receiving Clear Notice Of The Arbitration Agreement And Its Opt-Out Provision.

H&R Block provides both online and retail tax filing services. All online tax-filing clients—both new clients and returning ones—agree to the then-current H&R Block OSA. 2-ER-173. The OSA is typically updated each year; at all relevant times, it has included a provision requiring disputes to be resolved by arbitration on an individual basis. 2-ER-173.

Plaintiffs Pedro Rios, Jr. and Christian Marquez are H&R Block clients who have used H&R Block online tax filing services since 2017. 2-ER-174. Rios agreed to the operative OSA in this case on January 5, 2024, and Marquez did so on January 26, 2024. 2-ER-175. They also agreed to similar arbitration agreements in prior years (2-ER-176), including since the staging procedures for mass arbitrations were first introduced in 2021 (2-ER-89).

When Plaintiffs logged into their online accounts in January 2024, they each clicked a check box next to the statement: "I agree to the terms and conditions of the Electronic Communications Consent and the Online

6

<u>Services Agreement</u>, which includes the requirement that any dispute be resolved through binding arbitration." 2-ER-181. Plaintiffs were able to view the complete OSA, including the arbitration agreement, by clicking on the green, underlined hyperlink "<u>Online Services Agreement.</u>" 2-ER-174-175.

The OSA itself also highlights the existence of the arbitration agreement and the right to opt out on the first page:

> **THIS AGREEMENT INCLUDES A MUTUAL BINDING ARBITRATION AGREEMENT IN SECTION 11 THAT REQUIRES RESOLUTION OF DISPUTES BY INDIVIDUAL ARBITRATION UNLESS YOU OPT-OUT AS PROVIDED IN SECTION 11.**

2-ER-185.

The arbitration agreement itself is found under the boldfaced, underlined heading: "**<u>ARBITRATION IF A DISPUTE ARISES ('Arbitration Agreement').</u>**" 2-ER-199.

Notably, the OSA contains an all-bold provision—in a conspicuous box titled "**Arbitration Opt Out**"—allowing users to opt out of arbitration within 30 days after accepting the OSA by filling out an online form or mailing a simple letter:

7

> Arbitration Opt Out: You may opt out of this Arbitration Agreement within 30 days after you accept this Agreement by filling out the form at www.hrblock.com/goto/optout, or by sending a signed letter to Arbitration Opt Out, P.O. Box 32818, Kansas City, MO 64171. The letter should include your printed name, address, the first five digits of your Social Security Number, and the words "Reject Arbitration." If you opt out of this Arbitration Agreement, any prior arbitration agreement shall remain in force and effect.

2-ER-199. The prior versions of the OSA to which Plaintiffs agreed also allowed them to opt out of arbitration. 2-ER-207. Accordingly, Rios and Marquez could have opted out of arbitration altogether when they first signed up in 2017 and could have opted out of each subsequent version of the arbitration agreement in the following years—including the revisions addressing mass arbitration.

Neither Rios nor Marquez ever opted out of any H&R Block arbitration agreement, either when they initially signed up to use H&R Block's online services or at any other time. 2-ER-207.

## B. The Terms Of Plaintiffs' Arbitration Agreements.

Plaintiffs' agreements require arbitration on an individual basis of "all disputes and claims between you and the H&R Block Parties"—which include Defendants H&R Block, Inc. and HRB Tax Group, Inc. 2-ER-199. The agreement calls for arbitration conducted by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules. 2-ER-200.

8

Like many other agreements, the arbitration agreement also includes a pre-arbitration notice-of-dispute process that gives the parties an opportunity to resolve disputes before arbitration begins. Under that process, the party with a dispute first mails a notice of dispute to the other party. 2-ER-199-200. The agreement provides that the "Notice must be on an individual basis" and include "(1) the claimant's name, address, telephone number, and e-mail address; (2) the nature or basis of the dispute or claim; (3) the specific relief sought; and (4) the claimant's signature." 2-ER-200. Receipt of a "fully complete Notice" tolls "[a]ny applicable statute of limitations." 2-ER-200. The agreement also gives the parties 60 days to request an informal settlement conference (by phone or videoconference, such as by Zoom) to attempt to reach a resolution without the need for formal arbitration. 2-ER-200.

Under the bold heading "**Arbitration of similar claims**," the agreement requires a staged process for resolving mass claims:

- Tracking the AAA's Mass Arbitration rules, the process is triggered when "25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel."

- In the first stage, "each side shall select 10 cases (20 cases total) to be filed in arbitration and resolved individually by different arbitrators."

9

- If the remaining cases are unable to be resolved after the first round of staged proceedings, the process repeats with another 20 cases.

- If any claims still remain, the process continues, except that "a total of 50 cases may be filed each round (unless a higher number of cases is mutually agreed upon in writing)."

- Arbitrators "are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible, consistent with principles of fundamental fairness."

2-ER-201-202.

During the staging process, "no other cases may be filed in arbitration, and the AAA shall not accept, assess or demand fees for, or administer arbitrations that are commenced in violation of this section." 2-ER-201. The purpose of this sequencing is to defer the imposition of arbitration fees for cases that will not immediately proceed to arbitration, so that it is feasible for initial rounds of cases actually to be arbitrated on the merits. But consumers waiting for their turn face no risk of losing their claims, because the agreement tolls the statute of limitations: "If this section 11.6 applies to a Notice, the statute of limitations applicable to the claims and relief set forth in that Notice shall be tolled from the beginning date of the Informal Resolution Period [*i.e.*, once a complete Notice is received] until that Notice is selected for a bellwether proceeding, withdrawn, or otherwise resolved." 2-ER-202.

10

**C.** **Plaintiffs Invoke The Arbitration Process Multiple Times, Including As Part Of A Larger Group Of Similar Claims That Reflect Inadequate Vetting By Their Counsel.**

In July 2024—nine months before Rios and Marquez filed this lawsuit—the law firm of Zimmerman Reed sent notices of dispute to H&R Block on their behalf asserting similar claims. 2-ER-214-215; 2-ER-224-225. Typically, the claimants for these notices are solicited via ads on social media sites like Instagram, TikTok, and Facebook. *See* U.S. Chamber of Commerce Institute for Legal Reform, *Private Power, Public Harm: The Coercive Dynamics of Mass Arbitration* 16-36 (Dec. 2025), https://instituteforlegalreform.com/wp-content/uploads/2025/12/Private-Power-Public-Harm-Web.pdf (discussing common solicitation practices); U.S. Chamber of Commerce Institute for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* 21, 34 (Feb. 2023), https://instituteforlegalreform.com/wp-content/uploads/2023/02/Mass-Arbitration-Shakedown-digital.pdf.[2]

---

[2] One of the undersigned counsel for H&R Block was an author of the February 2023 report, and other lawyers at his law firm authored the December 2025 report.

Here, Plaintiffs' notices were part of a broader group of over 2,600 notices of dispute that Zimmerman Reed submitted on behalf of claimants that the firm purported to represent. 2-ER-170.

Although the OSA requires each claimant's notice to be sent by "mail" (2-ER-199), Zimmerman Reed sent H&R Block a single letter with a link to an online portal for accessing the notices (2-ER-68-69). Nonetheless, after an exchange of correspondence with Zimmerman Reed in which both sides "reserved all rights," H&R Block agreed to accept service of the notices. 2-ER-70.

As the record below demonstrates, these notices raised substantial questions about whether Zimmerman Reed undertook a reasonable investigation before asserting the claims.

*First*, other law firms had submitted similar notices of dispute on behalf of 23% of Zimmerman Reed's claimants—including Rios and Marquez themselves. 2-ER-88. As to Rios, a different law firm—Milberg Coleman Bryson Phillips Grossman PLLC—asserted similar claims almost a year before Zimmerman Reed sent a notice on his behalf. 2-ER-210-211. And a third firm—Labaton Keller Sucharow LLP asserted similar claims two months after Zimmerman Reed did. 2-ER-217-218.

12

The same was true of Marquez: Milberg had submitted notices on behalf of Marquez both a few months before, and two months after, Zimmerman Reed claimed to represent him. 2-ER-220-221; 2-ER-227-229.

*Second*, many Zimmerman Reed notices rested on demonstrably false allegations. Each notice asserted that, during the 2021 or 2022 tax seasons, the claimant had used H&R Block's online services to file tax returns and, in doing so, had purportedly been affected by alleged online privacy violations. 2-ER-170. But H&R Block's records demonstrated that over one in five claimants (20.6%) were either *never H&R Block clients at all* or never used H&R Block's *online* tax filing services (as opposed to retail or in-store services). 2-ER-171.[3] And another 19.2% of the claimants either never completed an online tax filing with H&R Block or did not do so during the 2021 or 2022 tax seasons (the relevant time frame for the alleged privacy violations, according to the notices). 2-ER-171. In total, the allegation that the claimant used H&R Block's services

---

[3]    The percentages in this paragraph are based on the number of unique notices, after removing eight duplicate notices from the pool. 2-ER-170.

to file his or her taxes online during the 2021 or 2022 tax season was false for nearly 40% of the notices. 2-ER-171.

The record also raised serious questions about whether Zimmerman Reed bothered to review the notices before sending them. Perhaps most egregiously, one notice was submitted on behalf of "**John Doe**" with the address "**1519 Tester Way**" in "**Test, California**"; the telephone number **"(123) 123-1234**"; an email address of "**John.Doe@tester.com**"; and a signature line signed as "**No Agreement**":

Sincerely,

*No Agreement*

| | |
|---|---|
| **Name** | John Doe |
| **Address** | 1519 Tester Way |
| | Test, California 90210 |
| **Telephone Number** | (123) 123-1234 |
| **Email** | John.Doe@tester.com |
| **SSN** | 12345 |

2-ER-91-92.

14

### D.    Plaintiffs File This Lawsuit.

Notwithstanding their arbitration agreements and the multiple notices of dispute demanding to arbitrate Plaintiffs' claims, Plaintiffs filed this putative class action on April 22, 2025. 2-ER-230. In their complaint, Plaintiffs alleged that H&R Block allowed data to be improperly transmitted to Meta or Google through tracking technology when Plaintiffs filed taxes online using H&R Block's services between 2020 and 2023. 2-ER-231. Plaintiffs also included allegations that their arbitration agreements are unconscionable. 2-ER-234-237.

### E.    The District Court Denies H&R Block's Motion To Compel Arbitration.

H&R Block responded to the complaint by moving to compel arbitration. Dkt. 18. Plaintiffs conceded that they agreed to arbitrate their claims but contended that their arbitration agreements are unconscionable under California law. Dkt. 25.

The district court denied H&R Block's motion. 1-ER-2-24. The court acknowledged that the arbitration agreement includes an opt-out provision and that "the arbitration clause is well flagged," but nonetheless determined that the arbitration agreement had "more than the required modicum of procedural unconscionability." 1-ER-11. In

response to H&R Block's arguments that, under this Court's decision in *Mohamed*, Plaintiffs' ability to opt out meant their arbitration agreements were not procedurally unconscionable, the district court concluded that *Mohamed* is "not dispositive of the procedural unconscionability question." 1-ER-11. The district court acknowledged that no intervening "controlling authority from the California Supreme Court" diverged from *Mohamed*. Nevertheless, it encouraged this Court to "revisit[] and overrule[] its own precedent" on the basis of intermediate California appellate decisions, most of them unpublished. 1-ER-13-15.

After setting aside the opt-out provision (despite *Mohamed*), the district court went on to conclude that the arbitration agreement reflected surprise and oppression. 1-ER-11-12. The court took issue in particular with "the *content* of the clause," most notably the staging procedures for large numbers of similar arbitrations. 1-ER-11. According to the district court, a consumer "would not reasonably anticipate HRB's complex bellwether and batching scheme." 1-ER-11. Rather than saying a single word about the undisputed evidence that nearly 40 percent of Zimmerman Reed's notices rested on false allegations, the district court faulted H&R Block for "reserving all rights" when agreeing to accept

16

service of "the mass notice" submitted by Zimmerman Reed, which the court believed "underscore[d] the uncertainty and surprise." 1-ER-12. Finally, without citing any record evidence or mentioning the undisputed fact that Plaintiffs each agreed to the operative OSA in *January* 2024 (months before the tax filing deadline), the district court concluded that the OSA also was oppressive because it was presented "in the midst of tax season and with the looming threat of IRS penalties." 1-ER-12.

The court next determined that two provisions in the arbitration agreement were substantively unconscionable: (1) the staging of mass claims, which the court believed "imposed unreasonable delays"; and (2) the tolling provision, which the court believed made tolling of coordinated claims "uncertain." 1-ER-16-22. According to the district court, H&R Block was required to introduce "evidence that the number of arbitrations that can be conducted simultaneously is inherently constrained by the AAA or any arbitral forum." 1-ER-20. The district court therefore rejected the comparison between the staged procedures and "the MDL bellwether process" in court—delays that the district court excused as being "driven by the limited resources of the public judiciary

17

and the practical realities of managing thousands of cases in federal court." 1-ER-20.

Finally, the district court refused to sever those provisions. In the district court's view, the two provisions sufficed to "permeate[] the entire arbitration agreement" with unconscionability and severance would be "ineffective" or amount to "a reward for bad faith corporate actors." 1-ER-22-23.[4]

## SUMMARY OF ARGUMENT

The district court's refusal to enforce the parties' arbitration agreements should be reversed.

**I.** The arbitration agreement is neither procedurally nor substantively unconscionable—much less both, as California law requires to invalidate a contract. The district court's holding to the contrary was error.

To begin with, the district court erred in holding that the arbitration clause is procedurally unconscionable. Under this Court's

---

[4] Although the district court's analysis of severance was misguided as well, this appeal challenges the district court's failure to enforce the arbitration agreement as written.

18

controlling precedent, Plaintiffs could not show procedural unconscionability because they had the right to opt out of arbitration. *See Mohamed*, 848 F.3d at 1211. The district court improperly refused to follow *Mohamed* (and this Court's precedents on which *Mohamed* was based)—the very error that led this Court to reverse the same district court in *Mohamed* itself. The district court contended that subsequent California intermediate appellate decisions should be read to displace *Mohamed*, but it grossly misread those decisions. In fact, those decisions address only circumstances where the opt-out right itself is not genuine. No such circumstances are presented here.

Even if the opt-out provision were not dispositive, the district court further erred in concluding that the arbitration agreement reflected unconscionable surprise or oppression. The district court admitted that the arbitration agreement is "well flagged." 1-ER-11. But the court committed a fundamental error when it held that the *substantive terms* of the arbitration agreement made the agreement *procedurally* unconscionable. The district court's decision to conflate procedural and substantive unconscionability flatly violates California law, as a panel of this Court recently held.

19

The district court's errors with respect to procedural unconscionability are sufficient in themselves to require reversal.

That said, the district court erred as to substantive unconscionability too—an independent reason for reversal. The court held that the staging of mass claims is substantively unconscionable because, in the court's view, it improperly delays resolution of those claims. That was incorrect. This process is modeled after the way federal courts handle large numbers of claims in mass tort multidistrict litigations because it facilitates global settlements. Other courts have upheld similar staging procedures, holding that they do not result in unconscionable delay—particularly when compared to the lack of real-world alternatives for resolving large numbers of individual claims. Plaintiffs presented no evidence that the cases could be resolved faster by the AAA than using H&R Block's orderly process, and the court below erred in relieving them of that burden of proof.

The district court also failed to consider the benefits of staging cases. That procedure is an appropriate response to widespread and documented abuses of the mass-arbitration process, in which some plaintiffs' counsel seek to weaponize the fees associated with

20

arbitration—which businesses largely subsidize—by filing as many unvetted claims as possible to extract a settlement based on those fees rather than on the underlying merits of the claims. Indeed, the record evidence in this case demonstrates that Plaintiffs' counsel here engaged in such abuses—although, again, the district court's decision never mentions that evidence.

Contrary to the district court's conclusions, the arbitration agreement's tolling provision does not create uncertainty about whether claims are tolled during the staging process. The provision begins tolling upon receipt of a "fully complete Notice" (2-ER-200), and the OSA specifies exactly what the notice requires—basic factual information—and therefore what it means to be "fully complete." Put another way, the terms provided an objective standard for whether tolling would be available; tolling is not, as the district court believed, based on H&R Block's subjective unilateral determinations. Moreover, the provision called for courts to resolve any disputes over whether a notice was "fully complete" (2-ER-200)—a feature the district court simply brushed aside.

**II.** Because there is nothing unconscionable about an orderly staging procedure modeled after procedures used in federal courts, the

21

district court not only misapplied California law in deviating from California's generally applicable unconscionability principles, but also violated the FAA by applying an arbitration-specific unconscionability standard. The FAA and its equal-footing principle preempt state-law rules that single out arbitration agreements for disfavored treatment. That is precisely what the district court's application of California unconscionability doctrine did here.

Moreover, the district court's unconscionability holdings conflict with the purposes and objectives of the FAA. By depriving companies of the ability to use common-sense procedures borrowed from the federal courts to protect against abuses of the arbitration process, the district court's reasoning forces companies to either face large numbers of unsupportable and unvetted claims in arbitration—and incur the associated arbitration fees—or submit to class actions in court. Imposing that choice on parties violates the FAA's policies favoring enforcement of agreements to arbitrate on an individual basis. At bottom, the district court's ruling reflects the very hostility to arbitration that the FAA was enacted to prevent.

## STANDARD OF REVIEW

This Court reviews the denial of a motion to compel arbitration de novo. *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1259 (9th Cir. 2017). This Court also reviews "[t]he interpretation and meaning of contract provisions de novo." *Id.* (citation omitted).

## ARGUMENT

The FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). The FAA "protect[s] pretty absolutely" parties' choice to resolve their disputes in "one-on-one arbitration" using "individualized" procedures and instructs courts "to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502, 506 (2018); *accord, e.g.*, *O'Dell v. Aya Healthcare Servs., Inc.*, 171 F.4th 1173, 1174 (9th Cir. 2026) ("A hallmark of the FAA is the enforcement of arbitration

23

agreements and the resolution of disputes in individualized, one-on-one proceedings.").

Here, the FAA requires enforcement of Plaintiffs' arbitration agreements. The district court's unconscionability holdings are both wrong as a matter of California law and preempted by the FAA.

## I. The District Court Erred In Holding That The Arbitration Agreement Is Unconscionable.

Under California law, Plaintiffs bear the burden of demonstrating that their contracts are *both* procedurally and substantively unconscionable. *Sanchez v. Valencia Holding Co.*, 353 P.3d 741, 748-49 (Cal. 2015). Procedural unconscionability "focus[es] on oppression or surprise due to unequal bargaining power," while substantive unconscionability addresses "overly harsh or one-sided results." *Id.*

Unconscionability is a demanding standard. "[T]he California Supreme Court has emphasized that 'unconscionability requires a substantial degree of unfairness *beyond a simple old-fashioned bad bargain.*'" *Mohamed*, 848 F.3d at 1210 (quoting *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 12 (Cal. 2016)). After all, "[c]ommerce depends on the enforceability, in most instances, of a duly executed written contract." *Baltazar*, 367 P.3d at 12.

24

Neither form of unconscionability (much less both) is present here.

### A. The Arbitration Agreement Is Not Procedurally Unconscionable.

#### 1. This Court's decision in *Mohamed* and the arbitration agreement's clear opt-out provision are dispositive.

The "threshold inquiry in California's unconscionability analysis is whether the arbitration agreement is adhesive." *Mohamed*, 848 F.3d at 1211 (citation omitted); *accord Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 689 (Cal. 2000). An adhesion contract is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Chamber of Commerce v. Bonta*, 62 F.4th 473, 488 (9th Cir. 2023) (citation omitted).

In *Mohamed*—and the line of cases that *Mohamed* reaffirmed—this Court "held that an arbitration agreement is not adhesive if there is an opportunity to opt out of it." 848 F.3d at 1211 (citing *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1059 (9th Cir. 2013) (en banc); *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199 (9th Cir. 2002)). And in the absence of adhesiveness, a contract term is generally not procedurally unconscionable. *Id.* For good reason: procedural unconscionability

25

focuses on "an absence of meaningful choice" in the contract formation process (*Baltazar*, 367 P.3d at 11 (citation omitted)), but the opportunity to opt out of the relevant contract term necessarily provides such a choice.

This Court's holding in *Mohamed* is controlling here and provides, standing alone, a sufficient basis for reversal.

In *Mohamed*, the same district court as in this case denied Uber's motion to compel arbitration, agreeing with the plaintiffs that the delegation provisions in two contracts "were procedurally and substantively unconscionable." 848 F.3d at 1210. As to procedural unconscionability, the district court conceded that, under this Court's precedents, a "meaningful right to opt-out of arbitration necessarily renders the arbitration clause (and the delegation clause specifically) procedurally conscionable *as a matter of law*." *Id.* (emphasis added; alterations omitted). Nevertheless, the district court then asserted that the opt-out in the first agreement was "buried in the agreement" and that it was "illusory" because it required drivers to opt out "either in person at Uber's San Francisco offices or by overnight delivery service." *Id.* at 1210-11. The second agreement did not have those defects, but the district court still refused to apply this Court's prior precedents in *Kilgore*

26

and *Circuit City*, stating that, in its view, those precedents "failed to apply California law as announced by the California Supreme Court" in *Gentry v. Superior Court*, 165 P.3d 556 (Cal. 2007). *See Mohamed*, 848 F.3d at 1211.

This Court reversed, holding that both agreements' opt-out provisions defeated any assertion of procedural unconscionability and yielded the conclusion that the "delegation provisions were not procedurally unconscionable." *Id.* at 1211; *see also Circuit City*, 283 F.3d at 1199 (describing adhesiveness as "the *necessary* element of procedural unconscionability") (emphasis added). Speaking in no uncertain terms, this Court admonished: "The district court does not have the authority to ignore circuit court precedent, and neither do we." *Mohamed*, 848 F.3d at 1211. Because *Gentry* "preceded our decision in *Kilgore*," the *Mohamed* court explained, the district court's "decision to ignore our precedent cannot be explained by any intervening California authority." *Id.* at 1211 n.5.

The Court also held that the district court in *Mohamed* erred in concluding that the opt-out right in the first agreement was "illusory," because "the contract bound Uber to accept opt-outs from those drivers

27

who followed the procedure it set forth." *Id.* at 1211. And that remained true even under the district court's view that "the opt-out provision was 'buried in the agreement,'" because "one who signs a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument"—particularly given the thirty days to review the contract and decide whether to opt out of arbitration. *Id.* (citation omitted).

This Court has continued to treat *Mohamed* as binding and reject procedural unconscionability challenges to arbitration agreements containing opt-out provisions. For example, the Court recently held that an arbitration provision in Google's terms was not procedurally unconscionable because of its opt-out provision. *Cal. Crane Sch., Inc. v. Google LLC*, 2025 WL 2541913, at *1 (9th Cir. Sept. 4, 2025). As the Court explained, "[i]f 'there is an opportunity to opt out,' then the agreement is 'not adhesive' *and thus not procedurally unconscionable.*" *Id.* (emphasis added) (quoting *Mohamed*, 848 F.3d at 1211).

Numerous district courts understand *Mohamed* the same way and have held that, "as a matter of law," an opt-out provision "negates procedural unconscionability." *Schlueter-Beckner v. SimpliSafe, Inc.*,

28

2025 WL 2162948, at *6-7 (N.D. Cal. July 30, 2025). As another court recently put it, "*Mohamed* controls the outcome in this case"; "[a]s in *Mohamed*, the arbitration agreement was not adhesive as it contained a meaningful opt out option, and the agreement here is therefore not procedurally unconscionable." *Chavoya v. Merrill Gardens L.L.C.*, 2025 WL 2196296, at *10 (E.D. Cal. July 31, 2025).[5]

Moreover, three district courts—including one in this Circuit applying *Mohamed*—have held that the arbitration agreement in H&R Block's OSA is not procedurally unconscionable for that exact reason. *See Hunt v. Meta Platforms, Inc.*, 729 F. Supp. 3d 964, 970 (N.D. Cal. 2024) (citing *Mohamed*, 848 F.3d at 1211); *see also Pabon v. HRB Digital LLC*, 2025 WL 2254008, at *4 (E.D.N.Y. Aug. 7, 2025) (applying New York law and concluding that the arbitration agreement is not procedurally

---

[5]    *See also, e.g.*, *Medhat v. JP Morgan Chase Bank, N.A.*, 2026 WL 1333764, at *3 (N.D. Cal. May 13, 2026); *Marquez v. Adobe, Inc.*, 2026 WL 886617, at *6 (N.D. Cal. Mar. 31, 2026); *Da Silva v. DSW Shoe Warehouse, Inc.*, 2025 WL 3187760, at *3 (N.D. Cal. Nov. 14, 2025); *Guerrero v. Citibank, N.A.*, 2025 WL 2483161, at *4 (N.D. Cal. Aug. 28, 2025); *Bonhomme v. Uber Techs., Inc.*, 2025 WL 1745729, at *3 (N.D. Cal. June 24, 2025); *Kaplan v. Athletic Media Co.*, 705 F. Supp. 3d 992, 1005 (N.D. Cal. 2023); *Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 944 (N.D. Cal. 2023).

unconscionable because there was a "meaningful opportunity to opt out") (citation omitted); *Caimano v. H&R Block*, 2024 WL 3295589, at *13 (E.D. Pa. July 3, 2024) (applying Pennsylvania law and concluding that "[t]he Online Services Agreement clearly and explicitly provided a simple step to opt out of arbitration"). It is telling that the district court did not even mention *Hunt* or the other cases enforcing the arbitration agreement in H&R Block's OSA.

Finally, the opt-out provision here is even clearer and more conspicuous than the one this Court upheld in *Mohamed*. It is flagged at the very outset of the OSA and presented in all-bold within a conspicuous black box. 2-ER-199; *see* pages 7-8, *supra*. Courts have recognized that the use of a "conspicuous black box" like the one here to offset a provision makes the provision "nearly impossible for [plaintiffs] to miss." *Fish v. Tesla, Inc.*, 2022 WL 1552137, at *6 (C.D. Cal. May 12, 2022).

In short, *Mohamed* controls and dictates reversal. Because California law requires both procedural and substantive unconscionability to invalidate a contract, the Court's analysis can stop at the absence of procedural unconscionability. That is the route this Court took in *Mohamed*, which declined to "reach the question whether

30

the agreements here were substantively unconscionable" because the plaintiffs could not show procedural unconscionability due to the opt-out provision in Uber's arbitration clause. 848 F.3d at 1211. And that is also the route the courts in *Hunt*, *Pabon*, and *Caimano* took to enforce the arbitration agreement in H&R Block's OSA.

The district court here should have done the same.

### 2. The district court's reasons for refusing to apply *Mohamed* are wrong.

Doubling down on the error that led to its reversal in *Mohamed*, the district court—seemingly in defiance of that decision—again relied on *Gentry* and cases applying it to assert that *Mohamed* and the opt-out provision here are not "dispositive" of "the procedural unconscionability question." 1-ER-11-16.

The district court's (most recent) choice to disregard this Court's controlling precedent was deeply misguided. When this Court interprets California (or another state's) law, that interpretation remains binding except in the narrow circumstances where there are sufficient "subsequent indication[s] from the California courts that our interpretation was incorrect." *AGK Sierra De Montserrat, L.P. v. Comerica Bank*, 109 F.4th 1132, 1136-37 (9th Cir. 2024) (citation

31

omitted). In *AGK*, for example, such narrow circumstances existed, leading the Court to decline to follow its forty-year-old interpretation of California law based on decisions that "contained essentially no reasoning," because there had since been "a half-dozen California cases that have gone the other way"—circumstances that "*strongly suggest* that [this Court's] interpretation of California law was incorrect." *Id.* (emphasis added).

The decisions that the district court cited don't come close to meeting that standard. They rely on the California Supreme Court's decision in *Gentry*, which pre-dates *Mohamed* and this Court's precedent on which *Mohamed* relied—and therefore cannot displace *Mohamed* and its progeny. *See Mohamed*, 848 F.3d at 1211 & n.5.

*Gentry* is distinguishable in all events. The *Gentry* court was concerned that a prospective Circuit City *employee* did not have an "authentic" choice to opt out of arbitration; the court surmised that the employee would face "pressure not to opt out of" arbitration based on the "economic power" employers wield over job-seekers and the way in which Circuit City presented the opt out as part of a handbook stating "WHY

32

ARBITRATION IS RIGHT FOR YOU AND CIRCUIT CITY." 165 P.3d at 574. There was no comparable pressure deterring opt-out rights here.

The post-*Mohamed* cases applying *Gentry* that the district court cited are likewise far afield. All but two are unpublished and therefore California does not accord them precedential effect. *See* Cal. R. Ct. 8.1115(a).[6] And the two published cases are inapposite.

In the first published case, unlike here, the defendant had forfeited any argument based on the opt-out by failing "to raise it in the trial court." *Swain v. LaserAway Med. Grp., Inc.*, 57 Cal.App.5th 59, 68 (2020). The court's discussion of the opt out was therefore dicta, but in any event distinguishable. *Swain* involved an agreement for laser hair removal that allowed an opt out only by "'written notice delivered to the physician'"— which was not practically possible because the plaintiff "never saw a physician." *Id.* at 69 (quoting the agreement). Here, Plaintiffs faced no

---

[6]     Unlike in California state courts, unpublished state court opinions may be *cited* in federal courts. *See Li v. ArcSoft, Inc.*, 160 F.4th 1063, 1066 (9th Cir. 2025); *State Farm Mut. Auto. Ins. v. Penske Truck Leasing Co.*, 2021 WL 4810642, at \*2 (9th Cir. Oct. 15, 2021). But they are not binding on *any* court and therefore could not displace this Court's existing precedents. *See State Farm*, 2021 WL 4810642, at \*2 (noting that "it would be improper for our court to rely upon this unpublished, uncitable case" to reach a different interpretation of California law).

such obstacle to opting out; they could use an online form. Moreover, the defendant also buried the arbitration agreement, pressured the plaintiff to sign the agreement right away, and never gave the plaintiff a copy (so she had no way of discovering her opt-out right after the fact). *Id.* A court in this Circuit had little difficulty following *Mohamed* and distinguishing *Swain* when, as here, "the arbitration agreement was not hidden" and "contained a bolded section setting out [plaintiff's] opt-out rights." *Rubio v. Aaron's LLC*, 2024 WL 4904512, at *7 (E.D. Cal. Nov. 27, 2024).

The second published case involved an elderly patient with dementia whose condition was rapidly worsening and who faced "temporal and financial pressure" from the defendant residential care facility to sign an admission agreement quickly. *Haydon v. Elegance at Dublin*, 97 Cal.App.5th 1280, 1288-89 (2023). Further, the arbitration provision was not contained "even in a separate section" of the lengthy facility contract, but instead presented as one of "over 20 unrelated 'miscellaneous' provisions spanning several pages at the end of the agreement." *Id.* That combination of circumstances, according to the court, meant that the plaintiff did not have the opportunity to make "an

authentic informed choice" about whether to opt out of arbitration. *Id.* (quoting *Gentry*, 165 P.3d at 574).

Taken together, *Swain* and *Haydon* at the very most mean that an opt-out provision may not be dispositive of procedural unconscionability in the very narrow circumstances when the opt-out process itself, or the manner in which the opt-out was presented, undermines the viability of the opt-out right.

This case presents no such concerns. The opt-out is conspicuously flagged at the start of the OSA and presented in a bold black box that is impossible to miss. *See* pages 7-8, *supra*. And Plaintiffs presented no evidence of obstacles to their ability to review the arbitration agreement during the 30-day opt-out period.

Next, the district court insisted that this Court's decision in *Poublon* narrowed *Mohamed*, reading *Poublon* to stand for the proposition that a non-adhesive arbitration agreement containing an opt-out provision can still be procedurally unconscionable due to "other indications of oppression or surprise." 1-ER-13 (quoting *Poublon*, 846 F.3d at 1261-62). But *Poublon* says nothing of the sort. The arbitration agreement in that case *did not contain an opt-out provision*, and the

35

defendant "concede[d]" that the agreement was adhesive. 846 F.3d at 1261. But because satisfying the baseline requirement of adhesion "would give rise to a low degree of procedural unconscionability at most," the *Poublon* court looked to whether "other indications of oppression or surprise" supported a *heightened* degree of procedural unconscionability. *Id.* at 1261-62. That is a far cry from the situation here. As in *Mohamed*, the meaningful opt-out right negates procedural unconscionability altogether.

Finally, the district court's conclusion that the opt-out was "potentially illusory" because customers, who often return to H&R Block each tax season, would have to opt out of each new agreement to avoid arbitration altogether (1-ER-16) cannot be squared with *Mohamed* either. As in *Mohamed*, the OSA requires H&R Block to honor timely opt outs. Plaintiffs do not contend otherwise, nor have they *ever* availed themselves of the opportunity to opt out.[7] That negates any finding of illusoriness under California law: "[a]n illusory promise is one containing

---

[7] The staging procedures were first introduced in 2021. 2-ER-89. Thus, even if Plaintiffs had not opted out of arbitration altogether, they could have opted out of those procedures beginning in 2021 and instead agreed to arbitrate under prior versions of the OSA.

36

words 'in promissory form that promise *nothing*' and which 'do not purport to put *any limitation* on the freedom of the alleged promisor.'" *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 912 (9th Cir. 2003) (emphases added) (quoting 2 Corbin on Contracts 142 (rev. ed. 1995)); *accord Mohamed*, 848 F.3d at 1211 (quoting *Flores*).

Applying these principles, the Third Circuit—in another case involving Uber—rejected the precise position that the district court adopted here. Because "[p]laintiffs had a meaningful right to opt out of every agreement that they were presented with," the Third Circuit explained, the opt-out provision is not illusory, even though the "requirement that they opt out of each new agreement is 'more burdensome' than a permanent opt-out right." *Singh v. Uber Techs., Inc.*, 67 F.4th 550, 564-65 (3d Cir. 2023) (quoting *Mohamed*, 848 F.3d at 1211). It is unsurprising, then, that *Hunt*, *Caimano*, and *Pabon* all have upheld the enforceability of materially identical versions of H&R Block's OSA containing the same opt-out process.

37

### 3. The arbitration agreement is neither surprising nor oppressive.

While there is no need to reach the issue in light of *Mohamed*, the district court's determination that the arbitration agreement is surprising and oppressive is wrong as well.

"Surprise involves the extent to which the terms of the bargain are hidden in a verbose printed form drafted by the party in a superior bargaining position," *Lanigan v. City of L.A.*, 199 Cal.App.4th 1020, 1035 (2011), and, as a result, the "party's consent was not an informed choice," *Dotson v. Amgen, Inc.*, 181 Cal.App.4th 975, 980 (2010).

In the procedural unconscionability context, "[o]ppression occurs where there is an inequality of bargaining power which results in a lack of real negotiation and an absence of meaningful choice." *Lanigan*, 199 Cal.App.4th at 1035. In other words, "oppression" in this context focuses on "the circumstances surrounding the negotiation and formation of the contract" (*Poublon*, 846 F.3d at 1260-61 (citation omitted)), not the substantive fairness of the contract's terms.

Neither standard is met here.

***No surprise***. As detailed above (at 6-8), there was nothing "hidden" (*Lanigan*, 199 Cal.App.4th at 1035) about the arbitration agreement in

38

the OSA. It was flagged right next to the box the customer must check during contract formation, again highlighted for the reader at the very beginning of the OSA, and was presented under clear and descriptive headings. Indeed, the district court acknowledged that "the arbitration clause is well flagged." 1-ER-11.

Given that acknowledgment, the district court's assertion that the arbitration agreement was nonetheless surprising because it begins "on page 15" of a 21-page contract (1-ER-11) makes no sense. "Surprise is not established simply because the arbitration provision is located near the end of the contract." *Davenport v. Nvidia Corp.*, 719 F. Supp. 3d 1019, 1030 (N.D. Cal. 2024). Even if H&R Block had not specifically called out the arbitration agreement to the customer's attention (which it did), the California Supreme Court has made clear that a business is "under no obligation to highlight the arbitration clause of its contract, nor [i]s it required to specifically call that clause to [the plaintiff's] attention." *Sanchez*, 353 P.3d at 751. Indeed, the contrary rule the district court here adopted is preempted by the FAA, which prohibits States from imposing a "special notice requirement" only on arbitration clauses. *Doctor's*

39

*Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *accord Sanchez*, 353 P.3d at 751 (citing *Casarotto*).

Rather than focus on the presentation of the arbitration agreement, the district court based its determination of surprise primarily on "the *content* of the clause"—in particular, its staging provisions for mass arbitrations. 1-ER-11. But for purposes of assessing "surprise" under California law, the district court improperly conflated procedural and substantive unconscionability. As this Court recently explained, "the fairness of an agreement's actual terms" is the realm of *substantive*, not procedural, unconscionability. *Pappas v. AMN Healthcare Servs., Inc.*, 2025 WL 3720922, at \*1 (9th Cir. Dec. 23, 2025).[8]

The district court's evidence-free assertion that contract provisions to address mass arbitration would be surprising to the ordinary consumer (1-ER-12) is also wrong on its own terms. Plaintiffs had the burden of demonstrating unconscionability (*Sanchez*, 353 P.3d at 748-

---

[8]    *Pappas* involved the opposite situation. The Court reversed the denial of arbitration when plaintiffs failed to show substantive unconscionability, because the alleged lack of clarity of the challenged provision contributed to at most procedural unconscionability. *Id.* (quoting *OTO, LLC v. Kho*, 447 P.3d 680, 690 (Cal. 2019)).

49), yet they failed to show that either they, or consumers in general, would be surprised by provisions addressing mass arbitration.

Nor could Plaintiffs have made that showing. Mass arbitration was far from a new phenomenon at the time Plaintiffs agreed to the OSA in 2024. *See Mass Arbitration Shakedown, supra,* at 18-21 (detailing mass arbitration campaigns from 2019 to 2023 against a variety of major companies). One recent article reports that, by 2022, mass arbitrations already comprised 75% of all arbitrations on the dockets of the AAA and JAMS (another major arbitration provider). Ayelet Sela, *Technologies of Mass Arbitration*, 41 Ohio St. J. Disp. Resol. 149, 154 (2026). And many consumers have encountered social media and other Internet advertisements soliciting claimants for mass arbitrations. *See id.* at 175-177; *Private Power, Public Harm, supra,* at 16-36 (discussing common solicitation practices); *see also* Amy J. Schmitz, *Promise and Pitfalls of AI in Mass Arbitration*, 27 Cardozo J. Confl. Resol. 291, 304-05 (2025) (describing the use of AI to onboard mass arbitration claimants).

The district court's position comes close to declaring a significant percentage—if not a majority—of consumer arbitration provisions procedurally unconscionable per se. Because mass arbitrations are now

a widespread phenomenon, so too are contractual provisions designed to address their abuses. But under the district court's view, *all* such provisions are inherently surprising and procedurally unconscionable. There is no basis in California law for such a sweeping conclusion, which is why no other court has ruled that way.

Such a rule also would be squarely preempted by the FAA. As noted above, the FAA prevents States from requiring heightened notice of an arbitration clause. *See Casarotto*, 517 U.S. at 687. It follows that States also cannot require heightened notice of specific terms *within* that clause, such as provisions addressing mass arbitration. Moreover, MDL courts use staged proceedings to resolve mass filings of similar individual lawsuits. Yet California does not deem all consumer contracts unfairly surprising because they do not prominently discuss how courts apply MDL procedures to mass filings. The district court's apparent view that companies must single out for heightened notice and explanation how mass claims will be handled in *arbitration* is far too arbitration-specific (and arbitration-disfavoring) to pass muster under the FAA's "equal-treatment principle." *Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*, 581 U.S. 246, 251 (2017).

42

Finally, there is no merit to the district court's determination that there is something surprising about the statement in the staging procedures that arbitrators are "*encouraged* to resolve the cases within 120 days of appointment or as swiftly as possible." 1-ER-12 (emphasis added). That statement obviously doesn't promise that the arbitration *will* be resolved by a date certain. And to the extent the post-contract formation arbitration proceedings reflected in the record below are relevant—and they should not be—the record shows that H&R Block *did* encourage arbitrators to decide test cases quickly and that the arbitrations were scheduled to accommodate *claimants'* counsel and confidential settlement discussions. *See* pages 56-57, *infra*.

***No oppression***. The district court's reasons for declaring the arbitration agreement oppressive fare no better. The court's assertion that "the OSA was imposed by HRB with no opportunity for consumers to negotiate or modify its terms" (1-ER-12) ignores that consumers could opt out of the arbitration agreement in the OSA altogether. Consumers therefore had a "meaningful choice" to reject the arbitration agreement. *Lanigan*, 199 Cal.App.4th at 1035.

43

The district court again erred by relying on its disagreement with the *substance* of the agreement's terms to establish oppression for purposes of procedural unconscionability. For example, the court stated that consumers "could not reasonably foresee that their ability to pursue claims would depend on the identity of their attorney or the number of other claimants represented by their attorney as a result of a complicated and unusual bellwether sequencing provision." 1-ER-12. But the staging procedures are clearly disclosed under the heading "**Arbitration of similar claims**," state explicitly that they are triggered when the "same or coordinated counsel" submit 25 or more notices raising similar claims, and inform consumers that the staging procedures "may delay the arbitration of your claim." 2-ER-201. So the district court could not legitimately suggest that the staging procedures were hidden from consumers during the contract formation process; instead, the court's procedural unconscionability holding rested on the substance of the staging provisions. And, again, consumers could opt out of arbitration altogether—or, at minimum, opt out of annual revisions to the arbitration provision, including the staging procedures introduced in 2021.

44

Beyond that, the district court declared that the arbitration agreement was oppressive because it was presented "in the midst of tax season and with the looming threat of IRS penalties." 1-ER-12. That unsupported assertion is flat out wrong. First, both Plaintiffs logged into their online accounts and agreed to the operative OSA in *January* 2024, months before any tax filing deadline. 2-ER-175. The district court simply ignored this undisputed point. Second, and more fundamentally, the tax filing deadline is irrelevant because customers always have 30 days to review and decide whether to opt out of the arbitration provision. In other words, a customer is free to obtain the benefits of the OSA and use H&R Block's online tax filing services to meet any filing deadline while *later* opting out of the OSA's arbitration agreement within the 30-day period. The district court's evidence-free conclusion that consumers have "little practical ability to reject arbitration" (1-ER-11) was therefore directly contrary to the language of the OSA—as well as multiple other decisions upholding H&R Block's opt-out provision.

* * *

In sum, Plaintiffs failed to show procedural unconscionability. The district court's ruling otherwise was error, and that error suffices to resolve this appeal and reverse the district court's denial of arbitration.

## B. The Arbitration Agreement Is Not Substantively Unconscionable.

To the extent the Court reaches substantive unconscionability, the district court's determination on that issue is wrong as well.

Substantive unconscionability requires proof that a contract term is "overly harsh," "unduly oppressive," or "so one-sided as to shock the conscience." *Sanchez*, 353 P.3d at 748 (quoting *Sonic-Calabasas A, Inc. v. Moreno*, 311 P.3d 184, 202 (Cal. 2013)). As discussed below, the district court improperly excused Plaintiffs from their burden of demonstrating that this level of unfairness existed. The district court also failed to meet its obligation to "examine the totality of the agreement's substantive terms" and determine the fairness of the parties' "overall bargain." *OTO*, 447 P.3d at 689. To the contrary, the district court entirely ignored both the commercial reasonableness of the challenged provisions and the real-world abuses of the arbitration process that they are designed to address.

46

### 1.    The staging procedures are enforceable.

The district court missed the mark in concluding that it is substantively unconscionable to agree to resolve similar and coordinated arbitrations through staged proceedings. 1-ER-17-20.

#### a.    *The staging procedures are modeled after MDL processes in court.*

The staging process for administering large numbers of individual arbitrations is modeled on the approach used by MDL courts to resolve large numbers of individual lawsuits—*i.e.*, to provide for bellwether trials designed to inform the parties about whether and how to settle the claims. Borrowing from established federal court procedures for resolving large numbers of individual claims cannot be so "'overly harsh' or 'one-sided'" as to be unconscionable. *See Sanchez*, 353 P.3d at 748.

In MDLs, the outcome of staged bellwether trials encourages merits-based settlement in two ways. First, by requiring preparation for trial, the process forces litigants to take a more realistic assessment of what evidence and arguments they can present. Hon. Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2341-42 (2008). Second, the outcomes of the trials provide "real-world evaluations of the litigation." *Id.* at 2325.

47

This Court has recognized the benefits of MDL test cases. Although such cases cannot force a global settlement, they are "designed to produce a verdict that would highlight the strengths and weaknesses of the parties' respective cases" and thus "promote [global] settlement." *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 995 (9th Cir. 2008); *see also, e.g., Briggs v. Merck Sharp & Dohme*, 796 F.3d 1038, 1051 (9th Cir. 2015) ("A bellwether trial is a test case that is typically used to facilitate settlement in similar cases . . . .").

In practice, MDLs—including staged bellwether trials—have proven to be remarkably effective at achieving settlements. Since 1968, when Congress passed the MDL statute, transferee courts have remanded back to the originating courts fewer than 2% of all cases consolidated into an MDL, which means that over 98% of cases were terminated in the MDL without a remand for trial.[9]

---

[9] *See* U.S. J.P.M.L., *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2025* at 3 (2025), https://bit.ly/4gK0bgV ("Since the creation of the Panel in 1968, . . . a total of 17,678 actions have been remanded for trial and 1,095,072 actions have been terminated in the transferee court.").

48

One study by an NYU School of Law center determined that between 2000 and 2015, 72% of the MDL case terminations resulted from settlement. NYU Center on Civil Justice, *What the Data Show: Mapping Trends in Multidistrict Litigation* (Sept. 2015), https://bit.ly/4fKdugj; *see also Manual for Complex Litigation, Fourth* § 20.132 (2004) ("Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court."). In short, "nothing encourages global MDL settlement like setting bellwether trials." Hon. Stephen R. Bough & Anne E. Case-Halferty, *A Judicial Perspective on Approaches to MDL Settlement*, 89 UMKC L. Rev. 971, 976 (2021) (quoting Special Master David Cohen).

The same dynamic can be expected to occur in mass arbitrations. Under H&R Block's provision, the parties would proceed with a first round of 20 bellwether arbitrations. 2-ER-201. Those arbitrations do not bind any other parties, but they provide useful information for the remaining participants in a mass arbitration. After that round of bellwethers is complete, each side could examine the results and determine how the arbitrators' assessment of the merits in the multiple arbitrations would inform settlement discussions and potential resolution of the claims. And if the first round does not yield an informed

49

resolution of the remaining claims, the process repeats and provides even more information to each side—with 50 bellwether arbitrations at a time after the second round. 2-ER-201-202.

The district court attempted to distinguish the MDL process on the basis that claimants in MDL proceedings can file claims on a court docket (1-ER-20), even if there is no other activity with respect to those claims while the bellwether cases proceed. But this distinction makes no difference. The claims of H&R Block customers are tolled, so in practice the provision changes only when the arbitration *fees* are due. And that change is salutary—it addresses the fee-based incentives to threaten or file illegitimate or unvetted claims, which have become prevalent in the mass-arbitration context. *See* pages 58-61, *infra*.

In sum, the staging process honors the parties' intent for bilateral arbitration and expedites merits-based resolution of *all* of the claims, which (as explained further below) could not realistically go forward all at once in the absence of the staging procedures. Just as MDL bellwether trials respond to real-world constraints on the ability of courts to try large numbers of individual claims at once, staging procedures create the same type of orderly process for resolving large numbers of arbitration claims

50

in the face of real-world constraints on the resources of arbitration providers, arbitrators, and counsel alike.

> b. *Other courts have upheld—or even required— similar staging procedures.*

Notably, other courts have recognized the benefits of staged proceedings in promoting fairness and orderly resolution of claims.

Take, for example, the lawsuit by Tubi over whether a law firm had improperly filed a large number of allegedly unvetted arbitrations and thereby tortiously interfered with Tubi's contracts with the claimants. *See* Compl., *Tubi, Inc. v. Keller Postman LLC*, No. 1:24-cv-01616 (D.D.C. May 31, 2024), Dkt. No. 1. Even though Tubi's agreement did not require the use of bellwether proceedings, to "actually get things moving" toward a resolution, the district court urged the parties to arbitrate—not all the cases, but "5 to 10" "bellwether arbitrations." Tr. 38, 40, *Tubi, Inc. v. Keller Postman LLC*, No. 1:24-cv-01616 (D.D.C. Dec. 19, 2024), Dkt. No. 29. Given the court's urging, the parties conferred over next steps, and about an hour later, agreed to just that (*id.* at 43-47)—because bellwether proceedings are a reasonable way to resolve large numbers of individual cases. And, in the end, the parties agreed to a global settlement of the underlying arbitrations. *See* Joint Status Report, *Tubi,*

*Inc. v. Keller Postman LLC*, No. 1:24-cv-01616 (D.D.C. Sept. 10, 2025), Dkt. No. 35.

Along these lines, courts have upheld similar staging procedures. In *Ruiz v. CarMax Auto Superstores, Inc.*, the agreement required "similar claims to proceed in batches of ten." 2024 WL 1136332, at \*6 (C.D. Cal. Jan. 18, 2024). Because the agreement's protocol "provide[d] for the tolling of any applicable statute of limitations," the court held that it "constitutes a 'system to adjudicate a group of cases with the purpose of facilitating global or widespread resolution,'" and so "is not substantively unconscionable." *Id.*

More recently, another California federal court upheld a staging process in T-Mobile's employment terms that called for resolving arbitrations in stages of fifty individual arbitrations at a time, holding that the procedures "preserve individual arbitration, do not unfairly prejudice non-batched cases, and do not present significant delay." *Diaz v. T-Mobile USA, Inc.*, 2026 WL 495233, at \*1-2, \*4 (E.D. Cal. Feb. 20, 2026). And at least two other courts have agreed that a "staging procedure" for mass claims is not "substantively unconscionable" when the agreement "tolls the applicable statute of limitations" for consumers.

52

*Brooks v. WarnerMedia Direct, LLC*, 2024 WL 3330305, at *17-18 (S.D.N.Y. July 8, 2024); *accord Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273, 297 (S.D.N.Y. 2025) (following *Brooks* in reaching same conclusion under either New York or California law).

This Court has stated without elaboration in a brief, unpublished opinion that a staged "batching provision" is "substantively unconscionable." *Pandolfi v. AviaGames, Inc.*, 2025 WL 2463742, at *2 (9th Cir. Aug. 27, 2025). That statement, which did not address *Ruiz*, *Brooks*, or *Pilon*, is of course not binding. But the panel in *Pandolfi* also appeared to have been primarily concerned about the *interaction* between the delegation clause and the staging procedures. *Id.* at *1-2. In particular, this Court was concerned that there was no mechanism for supervision of the staging process or intervention if it broke down, because a single process arbitrator could not rule on challenges to the enforceability of the arbitration agreement under the AAA rules. *See id.* at *1.

That is not the case here. Under the OSA, the enforceability of the arbitration agreement, including the staging process, is expressly reserved for a court. 2-ER-199; 2-ER-202. The district court's assertions

53

that *Pandolfi* is "similar" to this case and that the staging procedures "provide[] no recourse, oversight, or other accountability procedures in the event of delay" (1-ER-17-18) are therefore expressly contradicted by the OSA itself.

### c. Plaintiffs did not show that staging procedures would result in unconscionable delay.

More fundamentally, the district court's concerns about delay were misplaced. Plaintiffs failed to substantiate their assertions of unconscionable delay as a result of the staging procedures with any nonspeculative proof. Indeed, Plaintiffs did not even attempt to demonstrate delay compared to how long the same number of individual claims would take to resolve without an orderly staging process—either in arbitration or in court.

It is Plaintiffs' burden to prove unconscionability. *See Sanchez*, 353 P.3d at 748-49. Yet the district court relieved Plaintiffs of that burden— indeed, flipped that burden on its head—by instead requiring H&R Block to introduce evidence "that the number of arbitrations that can be conducted simultaneously is inherently constrained by the AAA or any arbitral forum." 1-ER-20. But common-sense dictates that, just as there are limited numbers of federal district judges, even the largest

54

arbitration providers like the AAA have real-world constraints on the number of arbitrators and their availability. This Court made that very point in another case involving a threatened mass arbitration, explaining that neither a court nor an arbitration provider (there, JAMS) "would tolerate having to try 7,300" similar cases at the same time. *Jones*, 129 F.4th at 1184. And, of course, there are also practical limits on the number of arbitrations that any plaintiffs' firm can realistically handle at one time.

Real-world data from the AAA supports these common-sense understandings. That organization has only around 4,900 total arbitrators (https://www.adr.org/about-us/)—across the country for all cases (not just consumer claims, and certainly not just for any single mass arbitration). The AAA also reports that in 2025, "[l]ess than 1%" of *filed* (much less threatened) consumer cases in mass arbitrations were resolved by a final award. https://www.adr.org/news-and-insights/what-2025-data-reveals-about-mass-arbitration/. Just like MDLs in court, the vast majority of filed arbitrations are resolved by settlement. *Id.* (reporting that 72% of consumer cases closed in 2025 settled); *see also What the Data Show*, *supra* (reporting the same 72% settlement rate for

terminated cases in MDLs). This further underscores the reality that, staging procedures or not, individual arbitrations could not possibly go forward simultaneously for thousands of arbitrations at a time. Indeed, Plaintiffs failed to submit any evidence of even a single mass arbitration in which thousands of cases were all arbitrated. They therefore have failed to show that H&R Block's more orderly MDL-type process yields conscience-shocking delay compared to the way that arbitrations would proceed in the absence of staging procedures.

The district court also improperly credited the carefully-worded declarations from other law firms that Plaintiffs submitted in an effort to fault H&R Block for what Plaintiffs perceived as delays in the staging process. For starters, those declarations are legally irrelevant because unconscionability is measured "at the time [the contract] was made." *Sanchez*, 353 P.3d at 755 (quoting Cal. Civ. Code § 1670.5).

What's more, their presentation is at best incomplete, and at worst outright inaccurate or misleading. Plaintiffs relied on three examples— the status of the arbitration in the *Caimano* case following the court's order compelling arbitration, and bellwether arbitrations brought by two other law firms (Korein Tillery and Milberg). 2-ER-95-98; 2-ER-111.

56

Plaintiffs' insinuations of delay should not have survived even minimal scrutiny: (1) in *Caimano*, the arbitrators had not even been appointed due to the parties' voluntary participation in the AAA's mediation program (2-ER-77); (2) in the 10 arbitrations brought by Korein Tillery and their co-counsel (the law firms refused to file the other 10), H&R Block proposed hearing dates within 120 days of the arbitrators' appointment, but *claimants' counsel rejected that proposal* and so H&R Block worked cooperatively to accommodate opposing counsel's schedule (2-ER-82-85); and (3) in the 20 arbitrations brought by Milberg, the perfunctory declaration by Milberg's lawyer omitted that the hearing dates and any continuances were all scheduled by agreement of the parties and the arbitrators; that several of the hearings were postponed while the parties engaged in confidential settlement discussions; and that all but two of the arbitrations had been resolved by voluntary dismissal or by a final hearing (2-ER-78-81).

This district court simply brushed aside all of this evidence and instead accepted Plaintiffs' distorted presentation of the facts because it fit the district court's preferred narrative of unconscionable delay. That cherry-picking of the record was not appropriate.

### d. Staging procedures are an appropriate response to widespread mass arbitration abuses.

California unconscionability law requires courts to consider the practical realities that might justify the inclusion of the challenged contract term. *See Sanchez*, 353 P.3d at 749; *George v. eBay, Inc.*, 71 Cal.App.5th 620, 630 (2021); Cal. Civ. Code § 1670.5(b). The district court failed to consider a key aspect of the "commercial setting, purpose, and effect" of the parties' arbitration agreement, *Sanchez*, 353 P.3d at 749 (quoting Cal. Civ. Code § 1670.5(b))—the rise of abusive mass arbitrations seeking to coerce settlements based on arbitral fees rather than the merits of the claims.

The rise of mass arbitration can lend itself to abuse. As in the mass tort setting, some plaintiffs' firms amass as large an inventory of claimants as possible; but unlike in court, these firms seek to leverage the threat of per-case arbitration fees to coerce a settlement, regardless of the merits of the claims. For example, if 10,000 consumer AAA arbitrations are filed and accepted for administration, a company's share of AAA fees would be $37.4 million—much of which would be due near the outset and could be nonrefundable even if the company wins every case. *See Private Power, Public Harm, supra*, at 15. Some plaintiffs' firms

58

threaten to saddle businesses with these fees, knowing that the fees can make it prohibitively expensive to defend against the claims, no matter how weak or frivolous those claims might be. And the firms therefore go to great lengths to circumvent procedures that might reduce a company's arbitration fees and facilitate merits-based resolution instead.

This Court has recognized as much, explaining that certain "mass-arbitration tactic[s] . . . appear[] to be geared more toward racking up procedural costs to the point of forcing [the company] to capitulate to a settlement than proving the allegations . . . to seek appropriate redress on the merits." *Jones*, 129 F.4th at 1183.

This dynamic also incentivizes some plaintiffs' firms to take unfortunate (and improper) shortcuts in vetting claims. The manner in which mass arbitrations are assembled—typically by using social media advertisements to gather claimants—greatly increases the risk that the underlying claims are illegitimate. *See Private Power, Public Harm*, *supra*, at 16-36; *Mass Arbitration Shakedown*, *supra*, at 21, 34. And examples abound of mass arbitrations containing large percentages of unsupportable claims. *See Private Power, Public Harm*, *supra*, at 28-31; *Mass Arbitration Shakedown*, *supra*, at 36-38.

59

This case presents those very concerns. As discussed above, the uncontradicted record evidence demonstrates that over 1 in 5 claims asserted in the Zimmerman Reed notices are patently frivolous because the *claimant never used* H&R Block's *online services at all*. That includes facially illegitimate claims like the "John Doe" notice described above. (Notably, Plaintiffs did not deny below that their counsel sent this notice without any review by a lawyer.) In addition, nearly 1 in 4 of the Zimmerman Reed claimants also purport to be simultaneously represented by additional, *different* law firms in asserting similar claims against H&R Block—including Rios and Marquez themselves, who purported to disclaim the other firms' representation only after H&R Block raised the issue below. *See* pages 11-13, *supra*; 2-ER-100; 2-ER-103.

These facts—none of which Plaintiffs disputed below—reflect the type of widespread vetting failures that have become all-too-prevalent in the mass-arbitration context. The district court never mentioned any of these issues in its decision—and for that matter never said a word about this Court's decision in *Jones*—instead choosing simply to ignore the practical realities that the staging procedures are designed to address.

60

And, at the hearing, the district court was similarly dismissive of these realities, saying mass arbitration "is the medicine your clients chose" and "if you get a lot of them [arbitration claims], I mean, that's the way it goes." 2-ER-59; 2-ER-62.

The district court also ignored the benefits to H&R Block customers of staged procedures. *All* parties benefit from having a functioning arbitration process that results in resolution based on the merits, which is the whole point of agreeing to arbitrate. And claimants who are part of mass filings benefit from an orderly staging process; if their case is not part of the initial stages, they are freed from the burdens of having to present their case—yet have the benefit of participating in settlement discussions informed by the results in the initial test cases.

In short, the district court ignored the benefits to the parties of the challenged staging procedures. It is commercially reasonable for companies to adopt provisions designed to ensure that arbitration remains a mechanism for resolving disputes on the merits—not a mechanism for some plaintiffs' lawyers to extract fee-based blackmail settlements.

61

e. *The district court's remaining criticisms of staging procedures are misplaced.*

The district court accepted Plaintiffs' criticism of the staging procedures for applying only when the claimants are represented by the "same or coordinated counsel." 1-ER-19. But that tracks the AAA's Mass Arbitration Supplementary Rules, which, to further efficiency and swift resolution, are triggered when "representation of all parties is consistent or coordinated across the cases." Rule MA-1(b)(iii). Accordingly, even *without* the language in the OSA's staging procedures, the AAA's default mass arbitration rules would apply only when there are shared counsel—yet no court has held that it is substantively unfair for parties to arbitrate under those rules.

The district court also asserted that the staging procedures would have a "one-sided effect" because they are likely to apply only to claims brought by consumers. 1-ER-18. But mass arbitrations—like class actions—are almost invariably brought by consumers against a company and not the other way around. Yet the law is clear that arbitration agreements precluding class proceedings are enforceable. *Concepcion*, 563 U.S. 333.

62

Simply put, the fact that mass arbitration is a one-sided phenomenon does not mean that California law forbids companies from utilizing reasonable procedures to address that phenomenon. California law does not require point-by-point mutuality of all contract terms. *See, e.g., Sanchez,* 353 P.3d at 749 (contract can provide "extra protection" to drafter).

Accordingly, the staging procedures are not substantively unconscionable on these grounds either.

### 2. The tolling provision in the pre-arbitration process is enforceable.

Below, Plaintiffs challenged the enforceability of the entire pre-arbitration notice-of-dispute and informal-settlement process in their arbitration agreements—even though Plaintiffs each demanded to participate in that process three times, including through different lawyers (*see* pages 11-13, *supra*). But the district court did not accept that broad challenge, and for good reason. Under California law, a pre-arbitration notice-of-dispute process, with its accompanying potential for "informal" resolution, "is both reasonable and laudable in an [arbitration] agreement." *Serpa v. Cal. Sur. Investigations, Inc.,* 215 Cal.App.4th 695, 710 (2013).

This Court has reached the same conclusion. When a district court held that it was unconscionable for Coinbase to require that consumers confer with customer support and submit a detailed notice of dispute before arbitration, this Court reversed, describing these requirements as "commonplace" and not "beyond the reasonable expectations of the user." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1014 (9th Cir. 2023). The Fourth Circuit has also upheld a pre-arbitration process similar to the one here, holding that there is "nothing unreasonable, let alone unconscionable, about such a provision," which "serves a commercially reasonable purpose by allowing both parties the opportunity to resolve disputes informally without incurring the expense of arbitration." *Meadows v. Cebridge Acquisition, LLC*, 132 F.4th 716, 732 (4th Cir. 2025) (applying West Virginia law).

The district court instead took issue only with the following sentence regarding tolling:

> Any applicable statute of limitations will be tolled for the claims and relief set forth in the Notice during the period between the date that either you or we send the other a fully complete Notice, until the later of (1) 60 days after receipt of the Notice; or (2) if a Settlement Conference is timely requested, 30 days after completion of the Settlement Conference (the "Informal Resolution Period").

2-ER-200. The district court concluded that the two words "fully complete" made tolling too "uncertain" in the context of mass arbitrations governed by the staging process in Section 11.6 of the OSA. 1-ER-21-22.

For at least three reasons, that conclusion was deeply misguided.

*First*, there is no merit to the district court's assertion that the "fully complete" qualifier is "not defined by any objective criteria" and "seems instead to be subject to HRB's exclusive interpretation." 1-ER-21. Section 11.2 of the OSA lists the four components of a fully complete notice: "(1) the claimant's name, address, telephone number, and e-mail address; (2) the nature or basis of the dispute or claim; (3) the specific relief sought; and (4) the claimant's signature." 2-ER-200. And, as a matter of contract law, a court—not H&R Block—is entitled to decide whether a claimant has met those objective criteria set forth in the contract. Indeed, the OSA makes clear that "[a] court will have authority to enforce this section 11.2," including to enjoin arbitrations "if the party who intends to seek arbitration does not first provide a fully complete Notice and participate in a timely requested Informal Settlement Conference." 2-ER-200. The district court recognized that this basic proposition—that the completeness of a notice is for a court, not H&R

Block, to decide—"is true on its face" (which is another way of saying "true") but inexplicably then turned around and deemed the "fully complete" qualifier too "ambiguous" and "subjective." 1-ER-22.

*Second*, and relatedly, the district court's concern about H&R Block's statement in a letter that it "expressly reserved the right" to challenge the validity of the Zimmerman Reed notices (1-ER-22) was misplaced. That standard language for preserving litigation positions does not change the objective meaning of the contract term or affect a court's assessment of a claimant's compliance with the term. Nor could it *retroactively* alter the term's fairness, which is measured at the time of contract formation. *See* page 56, *supra*.

Notably, Plaintiffs' counsel used the exact same language when submitting its notices, stating that "we do not concede that all pre-filing provisions relating to the arbitration of claims are enforceable and Claimants *reserve all rights* in that regard." 2-ER-132 (emphasis added). It would be absurd to suggest that using this language could take the enforceability issues away from the court—leaving the determination up to the subjective whims of the Zimmerman Reed claimants—but that is

66

effectively what the district court said about H&R Block's use of the same language.

*Finally*, the district court's assertion that the tolling provision "appears asymmetrical" (1-ER-22) is impossible to square with the plain text of the provision. The notice of dispute requirement applies to *any* "party who intends to seek arbitration"—either H&R Block or the customer. 2-ER-199. And the tolling provision likewise expressly applies when "either you *or we* send the other a fully complete Notice." 2-ER-200 (emphasis added). Accordingly, the district court was simply wrong in asserting that only H&R Block could "assert[] statute of limitations defenses" or "challenge[] tolling." 1-ER-22. And to the extent the district court's concern was that mass arbitration (like a class action) is inherently pursued by customers rather than a company, that is not a valid basis for invalidating a contract term. *See* pages 62-63, *supra*.

In sum, the district court erred in deeming the tolling provision substantively unconscionable.

### 3. The arbitration agreement does not offend *Heckman.*

Below, Plaintiffs additionally challenged the staging procedures and the class-action waiver in the arbitration agreement under *Heckman*

*v. Live Nation Entertainment, Inc.*, 120 F.4th 670 (9th Cir. 2024). 2-ER-234-237; Dkt. 25. The district court did not reach that argument, but the Court should reject any attempt by Plaintiffs to invoke *Heckman* as an alternative ground for affirmance.

In *Heckman*, this Court declared unconscionable a *sui generis* Ticketmaster arbitration clause that selected a newly created arbitration administrator (New Era) and adopted that administrator's rules. This Court emphasized that "New Era's Rules . . . differ significantly from the rules of traditional arbitration fora such as . . . the American Arbitration Association." 120 F.4th at 678.

Most notably, the *Heckman* Court understood the New Era rules to call for the outcomes of selected bellwether arbitrations to be treated as "precedent" that was "*binding* on the plaintiffs in all of the batched non-bellwether cases," even though the non-bellwether plaintiffs had no "notice" of the bellwether arbitrations, could not "be heard in" them, and had no "right to opt out" of their precedential effect. *Id.* at 684 (emphasis added).

By contrast, the arbitration agreement here expressly provides that the rulings in earlier arbitrations do *not* have preclusive effect: "No

68

arbitration award or decision will have any preclusive effect as to any issues or claims in any dispute, arbitration, or court proceeding where any party was not a named party in the arbitration, unless and except as required by applicable law." 2-ER-202. And the result would be the same even without that express language. This Court recently confirmed that giving arbitration awards preclusive effect to other plaintiffs is "anathema to the FAA" and its "hallmark" of "individualized, one-on-one proceedings." *O'Dell*, 171 F.4th at 1174.

For the same reasons, *Heckman*'s alternative holding that the FAA did not apply to Ticketmaster's arbitration clause because it would result in arbitration that is not "bilateral" and "individualized" is similarly inapplicable here. 120 F.4th at 689-90. The arbitration agreement here requires traditional individual arbitration for all claims that are not settled, and the agreement makes clear that bellwether rulings have no preclusive effect—the exact *opposite* of the approach to arbitral "precedent" deemed improper in *Heckman*.

Indeed, this Court has confirmed that *Heckman* is confined to its unusual facts. In rejecting an unconscionability challenge to an arbitration agreement incorporating the rules of JAMS, another

69

mainstream arbitration provider, the Court noted that *Heckman* "concerned novel arbitration procedures" (*i.e.*, the New Era rules) and that the JAMS rules did not "share[] even some of those defects." *Jones*, 129 F.4th at 1182-83. In other words, the "critical difference" underlying *Heckman*'s holding is that "[i]n a class or representative arbitration, an individual brings claims *on behalf of* others, whereas a claimant in a consolidated arbitration brings the claim in her *individual* capacity." *Id.* And the Court in *Jones* explained that consolidation under the JAMS rules "is not the same as class or representative arbitration" and does not present "the red flags associated with classwide arbitration" that were presented in *Heckman*. *Id.* at 1182.

Finally, district courts also have uniformly rejected attempts to extend *Heckman* beyond its unique facts. As Judge Breyer explained, *Heckman* must be given a "narrow reading" and does not apply when there "are no bellwether or representative proceedings that *bind absent parties*." *Cordero v. Coinbase, Inc.*, 2025 WL 2223495, at \*4-5 (N.D. Cal. Aug. 5, 2025) (emphasis added); *accord Davis v. Experian Info. Sols., Inc.*, 2025 WL 2998157, at \*7 (N.D. Cal. Oct. 24, 2025); *Wray v. Humble*

70

*Bundle, Inc.*, 2025 WL 4662288, at \*7-8 (N.D. Cal. Sept. 8, 2025); *Pilon*, 769 F. Supp. 3d at 296-98 (all distinguishing *Heckman*).

\* \* \*

In sum, Plaintiffs failed to show substantive unconscionability too. The district court should have enforced Plaintiffs' arbitration agreements.

## II. The FAA Preempts The District Court's Substantive Unconscionability Holdings.

If the district court were correct that California's law of substantive unconscionability prohibits parties from agreeing to orderly MDL-like procedures for resolving large numbers of claims, that state-law rule would be preempted by the FAA for two reasons.

*First*, the district court's ruling impermissibly targets arbitration agreements for invalidation. Section 2 of the FAA mandates that courts "place arbitration agreements on equal footing with all other contracts." *Kindred*, 581 U.S. at 248, 254-55; *see also Bonta*, 62 F.4th at 483-85 (describing the FAA's "equal-treatment principle"). Under the FAA's equal-footing principle, even generally applicable state-law contract defenses such as unconscionability are preempted if they are "applied in a fashion that disfavors arbitration." *Concepcion*, 563 U.S. at 341. Put

another way, the FAA "offers no refuge" for contract defenses "that derive their meaning from the fact that an agreement to arbitrate is at issue." *Epic*, 584 U.S. at 507-08 (citation omitted).

The district court's application of unconscionability doctrine reflects just those problems. Indeed, the "FAA . . . preempts any state rule discriminating on its face against arbitration," *Kindred*, 581 U.S. at 251, and the district court's blanket unconscionability rule against staging procedures would operate solely to invalidate arbitration agreements and thereby impermissibly "target arbitration [] by name," *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 188 (2019) (citation omitted). *See also Oblix, Inc. v. Winiecki*, 374 F.3d 488, 492 (7th Cir. 2004) (FAA forbids states from applying "any novel rule" to invalidate "arbitration agreements").

California, for example, does not consider MDL processes in court to be unconscionable; indeed, California imposes its own similar process, called Judicial Council Coordination Proceedings, in state courts. *See* Cal. R. Ct. 3.501-50. California therefore cannot adopt an "arbitration-specific" rule against agreements to use similar MDL processes in arbitration. *Kindred*, 581 U.S. at 254.

Similarly, as discussed above, California does not require point-by-point mutuality of all contract terms. *See, e.g., Sanchez,* 353 P.3d at 749. And outside of the arbitration context, California courts hold one-sided provisions "not unreasonable" when those provisions are "justified" by commercial realities. *Kurashige v. Indian Dunes, Inc.,* 200 Cal.App.3d 606, 614-15 (1988); *accord Allan v. Snow Summit, Inc.,* 51 Cal.App.4th 1358, 1377 (1996). The district court's insistence that the staging procedures must affect both sides equally in practice appears to have been designed solely to refuse enforcement of the arbitration agreement—precisely the type of arbitration-specific application of unconscionability doctrine that the FAA declares out of bounds.

*Second,* the district court's ruling obstructs "the full purposes and objectives of Congress" in enacting the FAA—which was to "ensure the enforcement of arbitration agreements according to their terms" and "to promote arbitration." *Concepcion,* 563 U.S. at 344-45, 352 (citation omitted). Specifically, the district court's prohibition on adopting staging procedures to address abuses of the arbitration process improperly strips parties of their "discretion in designing arbitration processes" that are "tailored to the type of dispute" and instead forces companies to face large

73

numbers of unsupportable and unvetted claims. *Id.* That is not the type of arbitration process to which the parties agreed, and it is "antithetical to the FAA's liberal federal policy favoring arbitration agreements." *Bonta*, 62 F.4th at 487 (citation omitted). Indeed, abusive mass arbitrations designed to coerce blackmail settlements are analogous to the type of "in terrorem" class arbitrations that led to the conflict preemption holding in *Concepcion* itself. *Concepcion*, 563 U.S. at 350; *see Mass Arbitration Shakedown*, *supra*, at 5-6, 24-30.

As explained above, the district court's decision itself simply ignored the practical reality that unsupportable and unvetted claims are prevalent in the mass-arbitration setting. *See* pages 58-61, *supra.* And at the hearing on the motion, the court's responses to those concerns were that "courts are pretty good" and a "class mechanism's a pretty good way of dealing with" large numbers of claims. 2-ER-63.

Those comments only underscore the preemption problem. It is by now well settled that the FAA protects agreements to resolve disputes by individual arbitration rather than through class actions in court. *See, e.g.*, *Lamps Plus*, 587 U.S. at 188; *Epic*, 584 U.S. at 502; *Concepcion*, 563 U.S. at 352. The district court's apparent preference for class litigation in

74

court over individual arbitration cannot justify its ruling either: Congress enacted the FAA "precisely to still" any "cry of 'unconscionable!' [that] just repackages the tired assertion that arbitration should be disparaged as second-class adjudication." *Carbajal v. H&R Block Tax Servs., Inc.*, 372 F.3d 903, 906 (7th Cir. 2004).

Finally, the Supreme Court has warned that, just as "antagonism toward arbitration before the Arbitration Act's enactment 'manifested itself in a great variety of devices and formulas declaring arbitration against public policy,'" courts "must be alert to new devices and formulas that would achieve much the same result today." *Epic*, 584 U.S. at 509 (quoting *Concepcion*, 563 U.S. at 342). The district court's invalidation of staging procedures is "just such a device" (*id.*): it makes arbitration artificially unattractive by conditioning the enforceability of arbitration agreements on companies accepting fee-based abuses of the arbitration process. And, as a result, it evinces the very "'hostility towards arbitration' that the FAA was enacted to overcome." *Bonta*, 62 F.4th at 487 (quoting *Concepcion*, 563 U.S. at 342).

75

## CONCLUSION

The Court should reverse the district court's order denying the motion to compel arbitration and remand with instructions to grant the motion.

Dated: July 20, 2026                    Respectfully submitted,

 

                                               /s/ Archis A. Parasharami

Stacey Gilman                           Archis A. Parasharami
BERKOWITZ OLIVER LLP               Daniel E. Jones
2600 Grand Boulevard                 SKADDEN, ARPS, SLATE,
Suite 1200                                    MEAGHER & FLOM LLP
Kansas City, MO 64108               1440 New York Avenue, N.W.
Telephone: 816-561-7007           Washington, DC 20005
sgilman@berkowitzoliver.com       Telephone: (202) 371-7160
                                                  archis.parasharami@skadden.com
                                                  daniel.jones@skadden.com

*Counsel for Defendants-Appellants HRB Digital, LLC
and HRB Tax Group, Inc.*

76

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the undersigned counsel states that there are no related cases pending before this Court.

Dated: July 20, 2026        Respectfully submitted,

                               */s/ Archis A. Parasharami*
                               Archis A. Parasharami

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1, I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-1(a) because this brief contains 13,985 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Dated: July 20, 2026          Respectfully submitted,

                              */s/ Archis A. Parasharami*
                              Archis A. Parasharami

78

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: July 20, 2026         Respectfully submitted,

*/s/ Archis A. Parasharami*
Archis A. Parasharami